IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| UNITED STATES OF AMERICA, Plaintiff, vs. LYNN WADE BARNEY, Defendant | MEMORANDUM OPINION & ORDER Case No. 2:04-CR-370 Judge Dee Benson |
|---|---|

## INTRODUCTION

Before the Court is defendant Lynn Wade Barney's motion to suppress evidence. The motion was referred to a magistrate judge pursuant to 28 U.S.C. § 636B(b)(1)(B). The magistrate judge heard testimony and oral argument regarding the motion on September 3, 2004, and November 19, 2004. The magistrate judge issued a Report and Recommendation on January 5, 2005, which found that the defendant was arrested without probable cause to believe that he had committed, or was about to be committing a crime. Accordingly, the magistrate judge held that the evidence obtained as a result of the unlawful seizure should be suppressed and defendant's motion to suppress should be granted.

The government timely filed an Objection to the Report on February 4, 2005, arguing the officers had probable cause to place the defendant in handcuffs when a firearm fell from his shorts. The Court held a status conference on March 21, 2005, where the Court requested further briefing from the parties on the following issues: (1) whether the officers' actions of placing the defendant on his knees and handcuffing him was a seizure in violation of defendant's Fourth Amendment rights; and (2) whether the inevitable discovery doctrine applies to the evidence

seized following the seizure. After reviewing all the factual materials presented in light of the relevant law, the Court REJECTS the magistrate judge's Report and Recommendation and DENIES defendant's motion to suppress for the reasons set forth below.

### BACKGROUND

I. **Evidentiary Hearing of September 3, 2004**

On May 11, 2004, at 4:00 p.m., Officer Carter of the St. George Police Department was dispatched to the Millcreek Cottages in St. George, Utah. (Transcript of Hearing, September 3, 2004 ("Tr") at 5-7). Officer Carter testified that the call "initially went out as a suspicious person, possible suicide. They mentioned that it looked like there was a knife in the lap of the person in the car as well as possible drug paraphernalia." (*Id.* at 6). This information was provided by an anonymous caller. (*Id.* at 10).

Just moments after Officer Carter got to the location, Deputy Lee of the Washington County's Sheriff's Office arrived as well. (*Id.* at 7). The officers found the defendant seated in a reclined position in the driver's seat of his small, green passenger car with the window down on the driver's side. (*Id.*). The officers approached the car from opposite sides with Officer Carter on the driver's side. Officer Carter yelled "really loudly," asking defendant if he could hear him and if he was okay. (*Id.* at 7-8). However, defendant did not respond. (*Id.* at 8). The officers then moved closer to the car with Officer Carter continuing to yell loudly. Officer Carter began banging or pounding on the side of the car near the window. (*Id.* at 8, 13).

Officer Carter testified that he was concerned because defendant did not look well, "looked really pale, a lot of sweat all over his body." (*Id.* at 8). Because Officer Carter had been yelling very loudly, and defendant had not responded, the officers thought something might be

2

wrong with him. (*Id.* at 8).

Officer Carter testified that as he continued yelling and banging on the car, defendant "kind of jerked awake."[1] (*Id.*). Defendant's eyes opened, and he apparently noticed the officers' presence for the first time. (*Id.*). Officer Carter testified that defendant "began acting very confused, making just really jerky, sudden movements with his hand and then with his whole body, just acting pretty unnaturally." (*Id.* at 8-9).

Officer Carter asked defendant if he was okay and if he could step out of the car so they could talk. According to Officer Carter, defendant said that was "fine." (*Id.* at 9). A third officer, Officer Tate, arrived about the time that Officer Carter asked defendant to exit the vehicle. (*Id.* at 11, 12-13). As defendant began standing up, Deputy Lee saw a small handgun fall from defendant's pants and land on the floorboard of the car. Deputy Lee yelled, "gun, gun." The officers then drew their weapons and secured defendant on the ground in handcuffs. (*Id.* at 9, 27, 29-30).

On cross-examination, Officer Carter estimated that a "couple of minutes" passed between the time the officers began trying to get defendant's attention and the time he actually awoke. (*Id.* at 12). Officer Carter further testified that prior to defendant's awakening, he believed that defendant was not conscious. (*Id.* at 14). Officer Carter could not remember defendant's exact response when he asked him if he was okay – just that he said something to indicate that he was alive. (*Id.* at 15). Defendant did not indicate that he was suffering from any specific discomfort, or problem, or complain that anything was wrong with him. (*Id.* at 15).

---

[1] Deputy Lee stated that Officer Carter "shook" the car, and defendant sat up in a "kind of frantic" state. (*Id.* at 25).

3

Prior to asking defendant to get out of the vehicle, Officer Carter did not observe any knife, drug paraphernalia, or the gun. (*Id.* at 15-16, 20). Likewise, he did not detect the odor of alcohol, or see any alcohol, drugs, pills, or medication. (*Id.* at 20).

Officer Carter testified that the reason he asked defendant to get out of the car was to assess his condition. (*Id.* at 17, 19). If defendant had declined to get out of the car, Officer Carter would not have allowed him to drive away. (*Id.* at 16). Officer Carter stated that he was an EMT and had dealt with medical problems before. He stated that defendant had acted strangely and did not appear to be healthy. (*Id.* at 16-17). Officer Carter believed that defendant might have been under the influence of alcohol or drugs. (*Id.* at 18). Further, because the call had mentioned a possible suicide, Officer Carter was concerned that defendant might have taken some drugs in a suicide attempt. (*Id.* at 18-19). Officer Carter testified that he would not have felt safe allowing defendant to drive off until he was able to further assess his condition. Officer Carter wanted Defendant to get out of the car, stand up, walk, talk, and see if he could function normally and appropriately for driving a car. (*Id.* at 19).

Deputy Lee also testified concerning defendant's condition, stating that he was "just sweaty, just looked to be something wrong with him medically." (*Id.* at 25). Deputy Lee further testified concerning his assessment of the way defendant responded to Officer Carter's questions: "There was something definitely not right. He was, either had a medical problem or a drug problem, something to that effect." (*Id.* at 26).

## II. Stipulated Facts from the Second Evidentiary Hearing

The parties stipulated to the following facts at the November 19, 2004, hearing: After the gun dropped to the floor of defendant's car, the officers drew their weapons, and ordered

4

defendant to drop to his knees and place his hands behind his head. He was then handcuffed and transported to the Purgatory Correctional Facility. At some point after defendant was handcuffed, he consented to a search of his car which revealed controlled substances, a scale, and a knife. Also, dispatch confirmed at that time that defendant was a felon. While in transit to Purgatory, defendant admitted to the use of controlled substances and to having a felony record. The following day, after defendant was given a *Miranda* warning, he consented to giving a blood sample which tested positive for methamphetamine. (*Id.* at 11-15).

### III. Additional Stipulated Facts

Based upon the Court's request at the March 21, 2005, status conference, the parties stipulated to the following supplemental facts: Deputy Lee was standing on the passenger side of the vehicle when he observed the defendant's firearm. At approximately the same time, Officer Tate observed a small object fall out of the vehicle as defendant was exiting the vehicle. After handcuffing defendant, Officer Tait asked him to identify the object that was on the ground outside of the vehicle. Defendant informed Officer Tait that it was a "measuring device." Defendant also stated that he used the device to purchase drugs for his own personal use to assure that he was not "ripped off."

After defendant was secured in handcuffs, Officer Carter obtained his consent to retrieve his driver's license from his wallet. Officer Carter then called the St. George dispatch and requested a warrants check. Dispatch responded to Officer Carter's request within five to ten minutes and informed him that defendant was on felony probation. Officer Carter questioned defendant about his possession of the gun based on the dispatch report, and defendant confirmed that he was on felony probation.

5

After Officer Carter learned of defendant's restricted status, Officer Tait obtained defendant's consent to search his vehicle. Officer Tait found the small semi-automatic .25 caliber Berretta that had fallen from defendant's shorts on the floor of the vehicle. The gun was loaded with a bullet in the chamber. In addition to the gun, Officer Tait found a large knife that was concealed between the driver's seat and center console of the vehicle. Officer Tate also found three pipes with suspected drug residue, various lighters, and controlled substances in the vehicle.

Approximately twenty to thirty minutes after defendant was placed in handcuffs, Officer Carter arrested him for possession of a loaded firearm by a restricted person and for possession of drug paraphernalia. Defendant was then transported to Dixie Regional Medical Center for a medical clearance. In route to the hospital, Officer Carter issued a *Miranda* warning to defendant. Defendant waived his *Miranda* rights and told Officer Carter that he had used methamphetamine earlier that day, he possessed the gun for protection, and the controlled substances found in his vehicle were for other individuals.

After defendant was given a medical clearance, Office Carter booked defendant for possession of a concealed weapon, possession of firearm by a felon, possession of a loaded firearm in a vehicle, possession of controlled substances and drug paraphernalia, and possession with intent to distribute controlled substances.

## ANALYSIS

**I.  The Officers' Actions of Placing the Defendant on His Knees and Handcuffing Him Did Not Escalate to an Illegal Arrest.**

The officers' actions of placing the defendant on his knees and handcuffing him was not a

seizure in violation of the defendant's Fourth Amendment rights because the officers acted reasonably under the circumstances. Once police officers make a stop based on reasonable suspicion, the scope of that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20 (1968); *United States v. Melendez-Garcia,* 28 F.3d 1046, 1051 (10th Cir. 1993). "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.' " *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir. 1993) (quoting *United States v. Hensley,* 469 U.S. 221, 235 (1985)).

"The government has the burden of demonstrating that the seizure 'it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.' " *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). Because there is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop, a court's "evaluation is guided by 'common sense and ordinary human experience.' " *United States v. King,* 990 F.2d 1552, 1562 (10th Cir. 1993) (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 542 (1985) (additional quotation omitted). Moreover, courts "must avoid 'unrealistic second-guessing' of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones." *Melendez-Garcia,* 28 F.3d at 1052 (citations and quotations omitted).

Although the Supreme Court has long allowed de minimus intrusions on the liberty of a person detained by a *Terry* stop to advance officer safety, the use of force such as handcuffs and

firearms is a far greater level of intrusion, and requires the government to demonstrate that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *King,* 990 F.2d at 1562 (quotation omitted).

The Tenth Circuit has held that the use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest when "the circumstances reasonably warrant such measures." *Perdue,* 8 F.3d at 1463-64. In *Perdue,* the court held that officers acted reasonably when they ordered the occupants out of a car at gunpoint and forced them to lie on the ground when the police had information to suggest that the suspects might be armed, it was late at night in a remote area, and there were only two officers. *Id.* ("Although effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an arrest in most scenarios, it was not unreasonable under these circumstances ... [T]he officers had reason to be concerned for their safety...."). Similarly, in *United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir. 1993), the court concluded that officers' display of firearms and use of handcuffs was reasonable when they were informed that the suspect had threatened to kill someone and they observed the suspect violently pounding his fists in his truck.

In the instant case, the government asserts that the officers' use of firearms and handcuffs to restrain defendant was reasonable for the following reasons. First, the officers' encounter with defendant required a "split-second judgment" based on the sudden and startling appearance of a firearm. Second, the officers were legitimately concerned for their safety, as well as the safety of the defendant, based on the totality of the circumstances involving the officers' encounter with defendant prior to the appearance of the gun. For example, the officers were responding to an anonymous call indicating "a suspicious person, possible suicide." (Tr. at 6). The caller also

8

stated "that it looked like there was a knife in the lap of the person in the car as well as possible drug paraphernalia." (*Id.*). Defendant failed to awaken or respond to Officer Carter's repeated attempts to alert him to his presence and defendant's sweaty and pale physical appearance heightened the officers' concerns that defendant was unconscious, under the influence of drugs, or other medical concern. (*Id.* at 8-9, 17-19). Moreover, after defendant reacted to Officer Carter's banging on the car, Deputy Lee observed that "immediately, [defendant's] hands went to his waistband . . . ." (*Id.* at 25). Deputy Lee also testified that defendant was acting "very nervous and his hands stayed right at his waistband, right at the very front – the button part of it. He kept fidgeting with something there." (*Id.* at 26). Finally, the government asserts that when the firearm fell from defendant's shorts, it was reasonable for the officers to believe that defendant posed a threat to their personal safety as well as his own.

The Court agrees with the government and finds that these circumstances reasonably warranted the officers' use of firearms and handcuffs. *Perdue,* 8 F.3d at 1463-64. At the outset of their encounter with defendant, the officers were reasonably concerned about the safety and welfare of the defendant in light of the anonymous tip indicating a possible suicide. The officers later corroborated the information provided by the anonymous tipster – namely that defendant looked suspicious and possessed a knife and drug paraphernalia. The officers observed defendant, who was only dressed in a pair of shorts, fidgeting with his waistband, and then the gun suddenly dropped to the floor when defendant attempted to exit the vehicle. At that moment, the encounter escalated to a potentially life threatening situation and the officers acted reasonably by drawing their firearms and handcuffing the defendant. The officers did not know if the defendant was suicidal or under the influence of drugs. They also did not know if the gun was

loaded, which the officers later discovered it was. In light of these circumstances, the officers were 'authorized to take such steps as [were] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.' " *Perdue*, 8 F.3d at 1462.

## II. Inevitable Discovery

Because the Court has determined that the officers' actions of placing the defendant on his knees and handcuffing him was not a seizure in violation of defendant's Fourth Amendment rights, the Court does not have to reach the second issue of whether the inevitable discovery doctrine applies in this case.

## CONCLUSION

Based upon the analysis above, the Court finds that the officers' actions of placing the defendant on his knees and handcuffing him was not a seizure in violation of defendant's Fourth Amendment rights because the officers acted reasonably under the circumstances. Accordingly, the Court REJECTS the magistrate's Report and Recommendation and DENIES defendant's motion to suppress.

IT IS SO ORDERED.

DATED this 20th day of May, 2005.

_____
Dee Benson
United States District Judge